# Case No. 12,068.

## The ROSLYN.

## The MIDLAND.

[9 Ben. 119; [1] 23 Int. Rev. Rec. 176.]

District Court, S. D. New York. May, 1877.

COURTS — CONFLICT OF JURISDICTION — SHERIFF'S AND MARSHAL'S LEVY — RECEIVER — STIPULATION—POSSESSION—ADMIRALTY—PROCESS — COLLUSION.

1. Libels having been filed against the ferryboats R. and M. and processes issued they were

1 [Reported by Robert D. Benedict. Esq.. and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

seized by a U. S. marshal and keepers placed on board but the running of the boats was not stopped. On the return day of the processes the marshal made return that he had attached the vessels, and J., who was trustee under a mortgage on the boats executed to him to secure certain bonds, appeared as "trustee and claimant," and McC. and H., the receivers of the N. J. M. R. R. Co., also appeared. Time to answer the libels was given and extended by various orders and finally expired without any answer being filed. The title to the boats was in the W. T. Co. of N. J. Prior to the marshal's seizure, the boats had been levied upon by the sheriff of the city and county of New York by virtue of certain attachments and executions issued out of a state court against the N. J. M. R. R. Co. Prior to the receipts by the sheriff of the attachments, the property of the N. J. M. R. R. Co. had passed into the hands of McC. and H. as receivers. The running of the boats had continued, and when the marshal seized them the sheriff made no objection, but the sheriff's keepers were kept on board. The sheriff required bonds of indemnity to secure him against the results of suits for trespass. and because of the marshal's seizure, the sheriff at once stopped a sale of the boats that he had advertised, and no proof was offered that he ever made return to the state court that the boats were held by him. J. then commenced an action in the New York supreme court to have the sheriff's levies declared void and to obtain the possession of the boats. To this action he made defendants the sheriff of the city and county of New York, the various parties in whose favor the sheriff had levied on the boats, and also McC. and H., but neither the libellants nor the marshal were made parties. An order was obtained enjoining the sheriff from further interference with the boats, and directing him to surrender possession to J., who was appointed receiver of the boats. J. appeared at the boats the next day with the order and the sheriff withdrew, but the marshal remained. Thereupon J. applied to the U. S. court for an order vacating the marshal's return, but the motion was denied because proper security had not been given, whereupon J. filed a petition in which he averred that the United States court had not legal possession nor jurisdiction, and asserted for himself, as receiver, the right to have exclusive possession, on the ground of the seizure and subsequent surrender of the boats to him by the sheriff, and the petition prayed for a like surrender by the marshal. J. at the same time filed a stipulation in each cause for $250. It was objected that this security was not enough, and J. was ordered to comply with the 34th admiralty rule. He thereupon, in compliance, filed security to double the amount of the claims in the usual form. No application for an order for the discharge of the boats was made after the stipulation was given, and no such order was made. Answers to the petition were then filed by the libellants and the marshal. Upon a hearing the petition was dismissed, interlocutory decrees were entered in the two cases in favor of the libellants and references were directed to ascertain the amount due. This having been done. the libellants moved for a decree upon the stipulations, which was opposed by a petition to be relieved from the stipulation, and for leave to take testimony and show that the libellants were not entitled to the decrees. Leave was given, and testimony was taken. and the causes being before the court on the motion for decree against the stipulators, and the petition of the stipulators to be relieved from their stipulation on the ground that it was simply a stipulation for costs. and that a stipulation of this character is void and cannot be enforced unless it appears that the boats are in the custody of the court: Held, that the stipulation was something more than a stipulation for costs, and that the language of the stipulation is the language of a se-

curity for the demand; that it is plain that the intention of the court in directing the security was to take security for the demand because it was ordered that the amount of the security be double the amount of the demands; that the stipulation is not simply a stipulation for costs, but is a security which permits resort to be had to it for the payment of the amount of the liens as ascertained by the proceedings had.

[Cited in The Berkeley, 58 Fed. 921.]

2. While in the ordinary case it might be contended that after giving a general appearance and a stipulation to secure the debt, it is too late to raise a question as to the service of the process, and that the legality of the custody of the property proceeded against has become immaterial, where a question is made as to the legality of the marshal's custody of the property proceeded against, and when it is at the same time desirable that security be given, the court has the power to permit a stipulation to be given to satisfy the decree, at the same time reserving to the party giving the stipulation a right to deny the legality of the custody claimed by the marshal, and, if successful in such denial, to ask to be relieved from his stipulation.

[Cited in The Monte A, 12 Fed. 335.]

3. Upon the assumption that the sheriff's levy was valid, it was terminated by the order of the state court appointing a receiver, and the marshal, being then on board the boats, immediately acquired possession, which he held without dispute until the next day, when the receiver appeared at the boats, and the result is the same if it be considered that the sheriff's authority was not discharged until the receiver appeared to demand possession.

4. Although the processes in rem had been returned by the marshal before the sheriff's custody was terminated, the life of such a process does not end with its return, and it affords authority and protection to the marshal until it is discharged or superseded by some other writ, and it is by virtue of the process alone, although return has been made, that the vessel is held in custody during the whole progress of the litigation. If at any time before the marshal was discharged his custody became legal, from that time at least the jurisdiction of the court was complete.

5. There is little room to doubt that the appointment of the receiver of the boats was collusive and procured for the sole purpose of defeating the jurisdiction of the court of admiralty. Therefore the claim of the receiver must be held to furnish no reason why the cases should not proceed to a final decree upon the stipulation.

6. The libellants are entitled to a decree upon the stipulation for the amount of their liens as established.

7. Afterwards J., the receiver, having applied to have the default against him opened and for leave to answer: *Held*, that his right to answer had been absolutely waived and that the court had no power to open the default.

In admiralty.

BENEDICT, District Judge. The nature of the questions involved in the determination of these two causes appears to require an extended statement of the proceedings.

The actions were commenced on the 9th day of June, 1875, by the filing of two libels in the district court of the United States for the Southern district of New York, to enforce liens which the libellants claim to have upon two ferry-boats named respectively the Roslyn and the Midland. The claim against the Midland is the sum of $1,458.50 and that against the Roslyn the sum of $6,783.94.

Upon the filing of the libels process in rem was duly issued in each cause, directing the marshal to seize and safely keep the vessels proceeded against.

These vessels were then employed upon the Weehawken Ferry. The Roslyn made constant trips between the state of New Jersey and the state of New York, carrying passengers to and fro. The Midland made similar trips on Sundays. During the week she carried cattle, making two or three trips a week, some to Jersey City, some to East Brooklyn and some to Vanderbilt's stock yard, and back to the ferry slip in New York City. The boats were necessary for the operation of the ferry and their removal therefrom would cause a stoppage of the ferry and serious public inconvenience. Upon receipt of the process the marshal proceeded to the boats and seized both the boats and placed on board keepers for the purpose of retaining his custody, but he did not stop the running of the boats.

The return day of these processes was the 29th of June, when the marshal made return to the court that he had attached the vessels in obedience to the process; and the process being called in court, the appearance of Conrad N. Jordan, "trustee and claimant in this cause," was duly entered by Chapman, Scott and Crowell, his proctors. The appearance of James W. McCullough and Garret A. Hobart, receivers of the New Jersey Midland Railroad Company, was likewise then entered by Alexander & Green, their proctors. The default of all others was then entered, and time to answer the libels applied for and given to the parties who had thus appeared, which time was thereafter extended by various orders to the 4th of August when it expired without any answer being filed by any person. It appears that the title to these boats was in the Weehawken Transportation Company, a foreign corporation of the state of New Jersey, and it also appears that in April they had been levied upon by the sheriff of the city and county of New York, by virtue of certain attachments and executions issued out of a court of the state against the property of the New Jersey Midland Railroad Company. It further appears that on April 2nd, and prior to the receipt by the sheriff of any attachment or execution against the New Jersey Midland Railroad Company, all the property of every description belonging to that company had passed into the hands of McCullough and Hobart, receivers appointed by the court of chancery of the state of New Jersey, and also by the supreme court of the state of New York. Neither the receiver of the Midland Railroad Company nor the sheriff had stopped the running of the boats, which at the time of the filing of the libels were in regular use upon the ferry, having to pass out of one state into the other on their reg-

ular trips as above described. When the marshal appeared on board the boats, having admiralty processes in rem directing him to seize them, the sheriff made no objection to his seizing them and permitted him to place keepers on board and to retain them there claiming to have custody of the boats by virtue of such seizure. But the sheriff's keepers were also kept on board. While the marshal was thus on board the boats, claiming to have possession thereof, and upon his return that he had seized the boats, McCullough and Hobart, the receivers of the property of the corporation against which the writs held by the sheriff ran, viz: the New Jersey Midland Railroad Company, entered, as before stated, an unqualified appearance in these causes without suggesting that the marshal's return was incorrect or making objection to his custody of the boats. At the same time Conrad N. Jordan, in the manner before stated, entered his unqualified appearance as claimant in the causes without any question as to the service of the processes.

Conrad N. Jordan, who thus made himself party claimant in these causes, was trustee under a mortgage upon these boats executed to him for the purpose of securing certain bonds, and it was as the representative of this mortgage interest that he appeared as such claimant.

After having thus made himself a party to these causes and on the 4th day of July, Jordan commenced an action in the supreme court of the state of New York to which action he made defendants the sheriff of the city and county of New York, the various parties in whose favor the sheriff had made his levy upon these boats, and also McCullough and Hobart, the receivers of the New York and New Jersey Midland Railroad Company. Neither the libellants nor the marshal were made parties to that action.

That action was ostensibly brought by Jordan to obtain a decree in the state court declaring the sheriff's levies, before referred to, to be void and that he be adjudged by the state court entitled to the possession of these boats by virtue of the mortgages executed to him as trustee for the bondholders.

Upon a motion made before answer, and by default so far as the sheriff and attaching creditors were concerned, and upon the written consent of McCullough and Hobart, receivers of the Midland Railroad Company, an order was made on the 27th day of July, in Jordan's suit, by which the sheriff was enjoined from further interfering with these boats and directed forthwith to surrender possession thereof to Jordan, who was by said order appointed to be receiver of said boats and directed to pay the sheriff's fees and to continue the running of the boats, and conduct and operate the ferry according to the course of business thereof.

On the 28th of July, Jordan appeared at the boats, and by virtue of this order granted the day before asserted a claim to the possession of the boats as receiver. The sheriff withdrew, but the marshal did not, nor was he ejected by Jordan but continued on board as before, and the boats continued their trips as before.

Here it is to be noticed, that the interest in these boats asserted by Jordan in his action brought in the supreme court of the state, was the same interest already represented by him as a claimant in the admiralty causes; that he was entitled to intervene in the admiralty causes for that interest, and could perfectly protect the same by virtue of his appearance therein; and it is quite apparent, if not directly proved, that the only parties really interested in these boats were the libellants for the amount of their liens and the mortgagees represented by Jordan. It is also apparent that the object sought to be attained by Jordan was to defeat the maritime liens. In the suit brought by Jordan in the supreme court the mortgage interest was represented but the maritime liens were not, and it is hardly too much to say that Jordan was the only party to that suit who had any interest in these boats. Jordan therefore easily procured himself to be appointed receiver of the boats. Thereupon, instead of answering in the admiralty causes as he had previously asked and obtained leave to do, now in the capacity of receiver, though still styled "claimant," he applied to the admiralty court by motion for an order vacating the return which the marshal had made to the processes in these actions, and instructing the marshal not to interfere with or obstruct the possession of these boats by himself or the sheriff.

This motion on the part of Jordan was, on August 5th, denied upon the preliminary objection that proper security had not been given. Whereupon on August 9th, Jordan filed in each cause a petition in which he averred that this court had not legal possession of the boats and had not legal jurisdiction to take the same, and asserted for himself as receiver the right to have sole and exclusive possession of the boats, setting forth as the ground of his claims the seizure of the boats by the sheriff of the city and county of New York, prior to the filing of the libels, the subsequent appointment of himself to be receiver of the boats, and the surrender of the boats to him by the sheriff on the 28th day of July. The prayer of this petition was that the marshal's return might be corrected, and that the attachment of the boats by the marshal might be set aside, and the marshal instructed to withdraw from the boats and surrender the same to Jordan. At the time of filing this petition Jordan also filed a stipulation in each cause for the sum of two hundred and fifty dollars. It was thereupon objected before the court that the security given was not sufficient. This objection the court held good and thereupon an order was made directing Jordan, "if he desired to avail himself of the benefit of the 34th rule, and

of the proceedings therein, to give security according to said rule in double the amount of each of said libellants' claims in each suit in the form required by said rule." This order was complied with and on August 30th, Jordan filed in each cause another stipulation, consenting therein that in case of default or contumacy on the part of said intervenor or sureties execution might issue, and stipulating and agreeing, for the benefit of whom it may concern, that the "stipulators undersigned and each and every of them is hereby bound in the sum of fourteen thousand dollars in one case and three thousand in the other case, that the intervenor shall abide by the final decree and pay all costs and expenses and damages which shall be awarded against him by the final decree of this court, or, upon appeal, by the appellate court." These stipulations having been filed, answers to the petition were filed by the libellants and the marshal.

It will perhaps conduce to the better understanding of the case to mention here the circumstance, that up to this time the contest in these actions had been had before Judge Blatchford, and that from this time forward for sufficient reasons and at the request of Judge Blatchford the contest was continued before me, sitting in the district court for the Southern district of New York.

A hearing having been had upon the petition filed by Jordan it was then determined first that the petition was not entitled to an order directing the marshal to alter his return upon the processes; second, that inasmuch as it had been made to appear that the petitioner had subsequent to this petition acquired the full and exclusive possession of the boats and was free from any interference by the marshal, the direction prayed for that the marshal withdraw from the boats and surrender them to the petitioner would be vain; —accordingly the petition was dismissed. [Case No. 12,067.]

After this disposition of the petition and upon due notice, no answer to the libels having been interposed by Jordan or any other person, the usual interlocutory decree was entered in each case in favor of the libellants, and references to a commissioner were directed to ascertain the amount due.

Upon these references before the commissioner the receivers of the New Jersey Midland Railroad Company appeared by their proctors, as of course did the libellants, but no other parties.

The amount reported by the commissioner to be due was in one case $5,368 56; in the other $1,568 06. No exceptions having been taken to these reports, thereupon the libellants upon due notice moved upon the proceedings in the causes for the usual decree for these amounts respectively, upon the stipulation given in pursuance of the order of Judge Blatchford made August 30th.

This motion was opposed in the form of a petition to be relieved from the stipulation and for leave to take testimony and to be permitted to present evidence and to show that the libellants are not entitled to the decrees moved for. Leave having been given to take testimony, and testimony having accordingly been taken, the causes are now before the court upon the motion for decree against the stipulators, and the petition of the stipulators to be relieved from their stipulation.

In opposition to the motion for a decree against the stipulators for the amount of the respective sums found to be due the libellants, it is contended that the stipulation is simply a stipulation for costs and is not security for the amount of the decree. But it is plain that the stipulation is something more than a stipulation for costs. The agreement is that Jordan shall abide by the final decree rendered in the cause and pay all such costs and expenses and damages as shall be awarded by the court upon the final decree. This language is the language of a security for the demand.

Furthermore, it is plain that the intention of the court in directing the security was to take security for the demands, because not only was a stipulation in the amount of $250 rejected, but it was ordered that the amount of the security be double the amount of the libellants' demands as set forth in the libel. It is manifest, therefore, that the judge in directing the security looked to a contingency in which the libellants might have to resort to the stipulation for the payment of the debt. It is true that no order for the discharge of the boats was made after the stipulation was given, but no application was made for such an order. It might have been supposed that an application for the release of the boats would follow as a matter of course after the stipulation had been filed, and as a matter of course be granted. Besides, it is not apparent that a delivery of the property is necessary to give effect to such a proceeding. But whatever might have been the intention of the court in respect to the release of the boats, it cannot be denied that it was intended to require of Jordan if he should intervene in pursuance of the 34th admiralty rule of the supreme court that he give a stipulation to which resort could be had for the payment of the debt in case the exigencies of the case should require that course. It has been said here that it would be absurd to exact such a stipulation from a third party intervening under rule 34, and therefore no such intention can be imputed to the court. But I do not see any necessary absurdity in requiring such a security. Resort to the 34th rule may be had under various circumstances and the rule is so framed that security for the debt may be taken. Cases may arise where the court could not permit a third party to intervene and raise a contest unless he were willing to assume the debt, and cases may arise where it would be justice to allow the property to be discharged from arrest upon security given

by a third party instead of the owner. It is too much to say that no case can arise where it would be reasonable to require a third party to secure the debt. In this case the court thought proper to require such security. The propriety of the order is not open for consideration. Until reviewed in an appellate court it stands in the case as having been duly made and complied with, and it is conclusive to show the intention of the court in requiring the security and the proper construction to be put upon the stipulation. Stipulations in admiralty are to be given the effect intended by the court, if their language will permit. The will or intention of the party is not regarded in their interpretation. Lane v. Townsend [Case No. 8,054].

I find then that the stipulation is not simply a stipulation for costs but is a security which permits resort to be had to it for the payment of the amount of the libellants' liens as ascertained by the proceedings had.

The next ground taken in opposition to the motion is that a stipulation of this character is void and cannot be enforced unless it appears that the boats were in the custody of the court. But assuming that it were the fact that the boats proceeded against were not in the custody of the court, that fact would not by itself alone of necessity render the stipulation void or prevent the court from enforcing it. It is a common practice, adopted for convenience and the saving of expense, to give a stipulation to secure the debt, upon simple notice of the filing of a libel. A stipulation given under such circumstances is valid, although in fact the vessel sought to be proceeded against is not, and never was, in custody.

The jurisdiction of the court, upon the giving of such a stipulation, to proceed with the cause to a decree and to enforce the stipulation according to its terms, has never to my knowledge been doubted. In such case the entering a general appearance and giving a stipulation to abide by a decree is deemed a waiver of all objection based on an omission to serve the process, and it is not thereafter open to the stipulators to deny the power of the court to compel them to perform their agreement. The form of the stipulation in admiralty was originally adopted to avoid a question of jurisdiction. A consent that execution might issue is incorporated in it and the instrument itself subjects the stipulators to the process of the court. 2 Browne, Civ. Law, p. 98.

In the English admiralty a settled practice is adopted to enable stipulations to be given without acquiring custody of the property proceeded against. Coote, Adm. p. 20, tit. "Caveat Warrant Book." So the provision for bonds to the marshal under the act of 1847 (Rev. St. U. S. § 941 [9 Stat. 181]) looks to enabling a proceeding in rem to be prosecuted without a seizure of the vessel.

In this connection may be considered a point—strongly urged by the libellants—based upon the fact that a general appearance and security was given by Jordan in these cases. It is said that as in other cases so here, it is not open to Jordan to deny the libellants' right to resort to the stipulation which he gave, and in which he consents that execution may issue for the amount found due; and that the question of the mode of serving the process, or of the custody of the property, does not now arise.

While in the ordinary case it might be contended that after giving a general appearance and a stipulation to secure the debt it is too late to raise a question as to the services of the process, and that the legality of the custody of the property proceeded against has become immaterial; I do not doubt that where a question is made as to the legality of the marshal's custody of the property proceeded against, and when it is at the same time desirable that security be given, the court has the power to permit a stipulation to be given to satisfy the decree, at the same time reserving to the party giving the stipulation a right to deny the legality of the custody claimed by the marshal, and if successful in such denial to ask to be relieved from his stipulation.

And such must the present case be considered to be. What Jordan desired was to dispute the legality of the marshal's custody of these boats. He filed a petition with the sole object of raising that question. Upon a preliminary objection he was required to give the stipulation under consideration, and it must be deemed to have been intended to reserve to him the right to ask at the hands of the court in some form or other a determination of that question.

The necessary inference from the circumstances under which the stipulation was given is that it was not intended to operate as a waiver of the right to present that question to the court.

I therefore hold that, notwithstanding the giving of the stipulation, it remained open to Jordan to contest the legality of the marshal's custody, and to ask to be relieved from his stipulation in case the result of such contestation should be in his favor.

That contestation he has seen fit to make upon the present motion, and I see no valid objection to the method selected. The libellants' motion appears to raise the precise point, for if when the stipulation was given the boats were legally in the custody of the court, the right to compel a performance of the stipulation can not be denied. If on the other hand the boats were not then legally in the custody of the marshal, the stipulators cannot be held, the right to raise that question having been reserved and the stipulation taken without prejudice to that right.

The effect I have thus given to the proceedings had in this case works no injustice to either party.

As to Jordan himself, he has the boats in his possession, discharged from these pro-

ceedings, and if it be determined that the marshal acquired a legal custody of the boats the liability upon the stipulation will be for the same debt from which, because of the stipulation, the boats will be freed.

As to the libellants, if they succeed upon this motion they will recover just what they would have recovered by the condemnation and sale of the boats; while if the motion be denied upon the objection taken by Jordan, for the same reason, they would have failed to obtain a valid decree of condemnation and sale.

I am thus brought to consider the question lying at the root of the present controversy, and that is, whether these boats were legally in the custody of this court and subject to its decree at the time when Jordan presented his petition for the removal of the marshal.

In examining the evidence bearing on this question I notice, first, that Jordan relies upon a prior possession of the sheriff of the city and county of New York which appears to have been wholly tortious. The writs held by the sheriff directed him to seize the property of the New Jersey Midland Railroad Company. But since the property of the Midland Railroad Company had already passed into the hands of Hobart and McCullough, receivers, the boats could not be lawfully seized by the sheriff as belonging to the Midland Railroad Company. Any interest the Midland Railroad Company may have had in the boats, had passed to the receivers of that corporation, and the receivers have filed a general appearance in these causes—have taken part in the reference to ascertain the amount of the libellants' claim—and do not dispute the custody of the boats asserted by the marshal.

Furthermore, it appears that the title of these boats was not in the New Jersey Midland Railroad Company, but in the Weehawken Transportation Company, a corporation against whose property the sheriff had no writ whatever.

It is not seen, therefore, how the sheriff could be other than a trespasser on board these boats. Such indeed he appears to have considered himself to be, for he had required bonds of indemnity to secure him against the results of suits for trespass. It was but natural, therefore, that the sheriff made no objection to the marshal's seizure of the boats by virtue of the processes issued in these actions, and acquiesced in the marshal's keepers being on board claiming to have the custody of these boats. Not only did he acquiesce in the presence of the marshal, but upon the marshal's making seizure, he, because of such seizure, at once stopped a sale of the boats that he had advertised, and I have not been able to find proof that he ever made return to the state court that the boats were held by him.

This evidence presents, then, the question whether a tortious presence of the sheriff on board a vessel is of itself sufficient to oust

the jurisdiction of the admiralty to seize the vessel in a proceeding in rem taken to enforce a maritime lien.

On the part of Jordan, it is contended that the libellants cannot ask this court to declare the sheriff's custody tortious, but must leave the determination of that question to the state court, and the decision of the supreme court of the United States in Freeman v. Howe, 24 How. [65 U. S.] 450, is cited as controlling authority to that effect.

The view I take of the cases under consideration renders it unnecessary to determine the question of the authority of this court to pronounce the sheriff's custody tortious, or to inquire in what way these maritime lien creditors could raise that question in the state court. But I remark that the supreme court of the United States in Buck v. Colbaith. 3 Wall. [70 U. S.] 345, expressly confine the operation of the rule declared in Freeman v. Howe, to parties before the court, or who may, if they wish to do so, come before the court. The libellants are not parties to the action in the state court, and it has not been suggested how they could bring before the state court the question they here raise.

Furthermore, in a case subsequent to Freeman v. Howe [supra], to which more particular reference is hereafter made (The Reindeer, 2 Wall. [69 U. S.] 383), it was held by the supreme court to be competent for a court of admiralty to pronounce a prior adverse seizure by the sheriff to be collusive, and for that reason unavailing to prevent the court of admiralty from proceeding to condemnation and sale.

There may therefore be room to contend here that these libellants are not debarred from requiring this court to determine whether the sheriff's seizure of the boats was not tortious, and if tortious to declare it no obstacle to the proceedings in rem.

And I may remark further that according to the law of this state, as I understand it to be declared by the courts of the state, property seized by the sheriff under circumstances similar to these will not be considered by the state courts to be in the custody of the law. "On an execution against the goods of A. the officer acts at his peril if he take the goods of B." Shipman v. Clark, 4 Denio, 446. "When the property seized is that of a stranger to the action and the seizure is that of a stranger to the action the property seized is not then in the custody of the law." Fairbanks v. Bloomfield, 5 Duer, 445 (Oakley, C. J., & Duer, J.)

If such be the law of the state the position taken by Jordan requires this court not to withhold its hand from these boats, because they are in the custody of a court of the state, when the court of the state considers them not to be in its custody and stands ready to condemn the sheriff in damages as a trespasser thereon.

In this connection attention may also be

-called to the decision of the supreme court of the United States in McKee v. Raines, 10 Wall. [77 U. S.] 25, where a marshal's seizure of the goods of one person in satisfaction of the dues of another is held not entitled to be considered a seizure made by virtue of any authority of law. But as before stated, I do not consider it necessary to determine the character of the sheriff's possession of these boats.

Another question is suggested by the evidence which I also pass, and that is whether the acts of the sheriff and of the judgment creditors in whose behalf he levied did not amount in law to an abandonment of the levy, so that the marshal's custody became in law the exclusive custody, and therefore valid to confer jurisdiction upon this court to condemn the property. In U. S. v. Conyngham [Case No. 14,850], it was held competent for the circuit court of the United States to examine into the circumstances attending a sheriff's levy and to determine that these circumstances by reason of their nature and consequences gave to the levy the character of a legal fraud, and the legal fraud having been found, it was adjudged that the first levy or seizure of the sheriff did not really exist in law or stand in the way of the second writ issued by the court of the United States. Similar questions in regard to the validity of prior levies have often been determined in the state courts, and not always in the court where process was first issued. Certainly the objection to a consideration of these questions by this court in these cases comes with ill grace from Jordan, who by his petition to be relieved from his stipulation has raised these questions, and should not complain if the court upon his petition should feel called on to decide them.

But, passing this question, I proceed upon the assumption that the sheriff's levy was valid and duly maintained until terminated by the order of the state court made June 27th, to consider whether at that time the marshal did not acquire custody of the boats valid in law and prior in time to Jordan.

It will be recollected that the order of the 27th of June granted by the state court on the application of Jordan terminated the sheriff's possession. He was by it enjoined from further interference with these boats and his fees directed to be paid. At the time that order was made the marshal was on board the boats by consent of the sheriff, claiming to hold the boats in his custody, and having keepers in charge. When therefore on the 28th of June, Jordan came to assert his right of possession as receiver, armed with the order of the state court directing him to take possession of the boats, the marshal was found to be there before him, armed with processes against the boats themselves, and prior in point of time to the order from which Jordan derived his right.

Can it then be said that Jordan acquired possession of these boats before the marshal?

It may be that permitting the marshal to make the seizure and to place and maintain keepers on board did not have the legal effect to supersede or destroy the sheriff's custody, but the fact remains that by permission of the sheriff the marshal was there, claiming the custody, when the sheriff's authority ceased; when therefore by that order the sheriff's authority was terminated, then, if not before, the marshal's custody became the only legal custody, and he became entitled to hold the boats as against all the world. This would not be doubted if the order of June 27th had done no more than to declare the sheriff's custody terminated.

But the order so far as it related to the writs held by the sheriff did nothing more. Its only effect upon the sheriff was to terminate his custody and release the boats from his levy. The provision in the order appointing Jordan to be receiver of the boats and directing him to take possession was part of another and separate suit commenced subsequent to the proceedings in admiralty. It created a new right, entirely distinct from any right of the sheriff, and it could not affect by relation the marshal's prior custody. Otherwise by instituting successive suits and by means of successive surrenders to other receivers and sheriffs a never-ending custody of the law could be created, to the destruction of the libellants' right to resort to a court of admiralty for the enforcement of their lien. Such a course of proceeding in the state courts is entirely possible, because it would only be necessary to take care that no person be made party to such subsequent suits who would have any interest to object, or to bring the circumstances to the attention of the state court.

The order of July 27th was effective to terminate the sheriff's custody, but it did not and could not create a custody in Jordan. It simply imposed upon Jordan the duty, when he had qualified, to acquire the custody of the boats, provided at that time the boats were not in custody of some other court. The sheriff's right to detain the boats was terminated and his responsibility ended when the order was made on the 27th of June, and from that time till Jordan appeared on the 28th, there was no one on board the boats having the right of possession except the marshal, but the result is the same if it be considered that the sheriff's authority was not discharged until Jordan had qualified and appeared to demand possession, for when he did appear he found the marshal there before him, and he could not reduce the boats to possession without ejecting the marshal. That was not attempted; on the contrary Jordan applied to this court to declare him entitled to the possession and to direct the marshal to surrender to him.

But it is said the processes in rem had been returned by the marshal before the sheriff's custody was terminated and there was no longer any life in the processes to

authorize the marshal, at that time, to acquire a lawful custody. It appears, however, to me to be a misapprehension to suppose that the life of an admiralty process in rem ends with the return of the process. On the contrary the process still lives and affords authority and protection to the marshal until it is discharged or superseded by some other writ, and it is by virtue of the process alone, although return has been made thereon, that the vessel is held in custody by the marshal during the whole progress of the litigation, not only in this court, but, it may be, even in the appellate courts.

In this instance, upon the return day the marshal made return that he had seized the boats. After such a return no other process was needed or could properly issue, and if an alias process had been issued the return would have been the same. When this return was made the marshal had made a seizure of the boats that he claimed to be lawful, and whether legal or not at that time, if at any time before the marshal was discharged, his custody became legal, I do not doubt that, from that time at least, the jurisdiction of this court was complete.

The conclusions I have thus arrived at compel a determination that the objection taken by Jordan cannot be sustained and that the libellants are entitled to a decree upon the stipulation for the amount of their liens as established.

In reaching these conclusions I have in no way trenched upon the rule of law declared by the supreme court of the United States in the much criticized case (see Pars. Mar. Law, p. 522) of Taylor v. Carryl [20 How. (61 U. S.) 583], a case that has been confidently cited in behalf of Jordan as identical with the cases before the court and binding authority adverse to the claims of the libellants herein. But I think the cases are not identical. The case of Taylor v. Carryl presented a question of title founded upon a decree rendered by a court of admiralty against the Royal Saxon, where the marshal instead of making an actual seizure, to use the language of the court "prudently retired and reported to the court that the vessel was in custody of the sheriff." Here no such thing occurred, but the contrary. In that case the validity of the sheriff's levy was not doubted. It was, moreover, duly maintained. No question of a fraudulent levy or tortious possession or dormant execution was raised by the marshal or any one else, but the marshal was excluded by the sheriff, and he so returned the fact to the court of admiralty.

The language used in the decision of the court undoubtedly goes very far, but I do not think it can be fairly considered to be authority for the doctrine that the mere fact of a previous levy made by the sheriff of the county under color of an execution out of a state court, whether such be fraudulent, collusive or void, and without regard to the nature of the custody maintained, and whether the state tribunals adopt or repudiate the sheriff's action, is of its own force, and under all circumstances absolute protection against the process of the court of admiralty, directed against the property itself, issued in a proceeding in rem to enforce a maritime lien confessedly superior to all other subsisting rights in the property.

The decision of the supreme court in the later case of The Reindeer, already referred to, is inconsistent with such a doctrine. That was the case of a proceeding in rem against the Reindeer, where the sheriff had made a prior levy upon the vessel, by virtue of an attachment against the property of her owner, and where notwithstanding such prior levy the marshal made a seizure of the vessel, and the court thereupon proceeded in the cause to a final decree. In the circuit court the jurisdiction of the district court was sustained—U. S. v. The Reindeer [Case No. 16,144]—apparently upon the ground that proceedings in rem to enforce the revenue laws were to be excepted from the rule declared in Taylor v. Carryl [supra]. In the supreme court no such distinction is alluded to, but a distinction between the two cases is found in the fact that in Taylor v. Carryl the possession of the sheriff was not only prior but exclusive, while in the case of The Reindeer, a custom house officer was on board, placed there by the collector immediately on the arrival of the vessel. Two points were determined by the supreme court in that case: First, that the presence of the inspector of customs was sufficient to prevent the sheriff from acquiring a custody such as would prevent a subsequent seizure by the marshal; and second, that the sheriff's levy was collusive and for that reason also of no effect to prevent a valid seizure by the marshal.

It is unnecessary if indeed it were proper here to consider the powers and duties of an inspector of customs placed on board a vessel "for the purpose of examining the vessel's cargo and superintending the delivery of so much of it as may be delivered in the United States, and performing such other legal services for the better security of the public revenue as shall be directed by the collector"—Rev. St. §§ 2875–2877; Regulations of the Treasury, tit. "Inspectors" (Ed. 1857) p. 343—as bearing upon the legal effect of the presence of an inspector of customs to transfer the vessel herself to the custody of a court of the United States, or to prevent a levy thereon by the sheriff. Nor does it appear worth while to extend this opinion in order to determine the efficacy of the marshal's presence on these boats as compared with that of the inspector of customs shown in the case of The Reindeer.

The second ground taken by the supreme court is sufficient for the purposes of these cases. Indeed the principle upon which the decision rests is broad enough to cover not

only cases of a collusive levy by the sheriff, but also cases where the levy is found to be fraudulent in law, as in U. S. v. Conyngham, before referred to, or where the levy is for any reason invalid.

I find therefore in the case of The Reindeer authority to support the jurisdiction of the court over these boats upon another ground. For there is' little room to doubt that the appointment of Jordan to be receiver of these boats was collusive and procured for the sole purpose of defeating the jurisdiction of the court of admiralty. The time and manner of procuring himself to be appointed receiver in an action where in reality he was the only party having an interest, and the attending circumstances, show clearly the collusive not to say fraudulent nature of the proceedings. Upon the authority of the supreme court in the case of The Reindeer, therefore, the claim of Jordan must be held by this court to furnish no reason why the causes should not proceed to a final decree upon the stipulation given.

I therefore rest my decision of the main question in these causes upon two grounds: First, upon the ground that the marshal acquired a legal custody of the boats in advance of the time when Jordan did or could acquire the custody; second, upon the ground that if Jordan's possession were prior to that of the marshal it was collusive, and for that reason no obstacle to the jurisdiction of this court. It may be added that if I entertained greater doubts than I do respecting the law of these cases it would be a proper reason for granting the motion of the libellants to enforce the stipulation, that by so doing the questions at issue can be presented to the circuit court upon appeal, while in case of a refusal to enforce the stipulation it might be difficult for the libellants to obtain a review, as the causes are situated.

In conclusion I have only to say that if the method here adopted for the purpose of defeating the libellants' lien be successful, it is plain to see that it lies in the power, not only of every state court, but of every constable, to prevent the enforcement of any maritime lien, and so effectually destroy it. All that will be necessary is that the shipowner procure some constable, having an execution against some third person, to seize his ship as the property of such person.

Nay, more, the way is made easy to defeat the jurisdiction of the United States in all cases of proceedings in rem. The appointment of a receiver for a distillery or a sheriff's levy upon an illicit still, will effectually prevent the enforcement of the revenue laws. Until better instructed I must decline to believe that either justice or expediency requires the establishment of such a method of defeating actions in rem. Let decrees be entered upon the stipulations in these causes for the amount reported due, with interest and costs.

Subsequently (June, 1877) the receiver applied to have the default taken against him opened, and leave to answer.

BENEDICT, District Judge. The application now made in these cases on the part of Conrad N. Jordan, receiver, to have the default taken against him opened, and to be permitted now to file an answer in these causes, is not, under the circumstances, one addressed to the discretion of the court. The omission to answer has been so deliberate, that the right to answer to the merits must be deemed to have been absolutely waived, unless it be true, as contended in behalf of the applicant, that, under the circumstances he could not properly be called on to answer until after a decision of the court upon the question whether such a seizure of the vessels proceeded against had been made, as would, in the opinion of the court, justify further proceedings in the causes. The contention is, that, after giving the stipulation in accordance with the order of Judge Blatchford, an answer to the merits, without a previous determination that the marshal had the vessels in custody, would have waived the right to question the marshal's custody, and, consequently, that no answer could be called for until now.

The action taken by Judge Blatchford, which resulted in the order of August 6th, 1875, was equivalent to a determination that the question of the marshal's custody would not be passed on upon a summary application, but that, if the applicant desired to avail himself of the 34th admiralty rule, he could raise that question under the rule, and would not waive the right to raise that question by giving the stipulation required.

That determination has not since been open to be re-examined, and has not been intended to be reviewed, although, when a hearing upon the petition was subsequently pressed, the petition was dismissed upon the ground, that, as the petitioner had, since filing his petition, acquired the undisputed possession of the vessels, an application for an order directing the delivery to him was vain. The right to answer in the cause was not then denied. On the contrary, a new opportunity to answer was given by a subsequent and special order; and, when that opportunity to answer was not availed of, it was still held, upon the motion for a decree upon the stipulation, that the giving of the stipulation, under the circumstances, did not waive the right to raise the question of the marshal's custody, upon that motion.

After such proceedings had, it is not open to the applicant to say that he could not answer without waiving the question of the marshal's custody, and, therefore, is now, for the first time, in a position where he can answer. On the contrary, he must be held to have formally waived the right to raise any question in the case, save only the question of the marshal's custody. A waiver so

formally made is beyond the power of the court to disregard.

It has been suggested here, that, if the default be allowed to stand, it will be urged by the libellants in the appellate court, that the applicant has no right to a review of the determination made by this court upon the motion for a decree upon the stipulation. If any foundation for the suggestion existed, it would go far to justify some stretching of the law, so as to permit the opening of the default to be treated as a question of discretion, and to require the opening of the default, in order to preserve the right of review. But the suggestion appears to be without foundation. I can see no possible ground for doubting that the appellate court will, upon an appeal, have full power to re-examine the question of the marshal's custody; and that is the only question that the applicant has cared until now to have adjudicated.

Furthermore, the libellants, upon this motion, have in a positive and formal manner, conceded the applicant's right to a review of that question upon appeal; and that admission may properly be taken as, in part, the foundation of the court's action in denying the present motion, which, as before said, has not been considered as addressed to the discretion of the court, and is not here disposed of as such; but the order asked for is denied as being beyond the power of the court, under the circumstances.